Filed 3/5/15  P. v. Russell CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>JAMES ROBERT RUSSELL II,<br><br>       Defendant and Appellant. | C071589<br><br>(Super. Ct. No. CRF105078) |

Defendant James Robert Russell II pleaded no contest to possession of methamphetamine for sale and admitted he had a prior drug trafficking conviction and had served two prior prison terms.  (Health & Saf. Code, §§ 11378, 11370.2, subd. (c)[1]; Pen. Code, § 667.5, subd. (b).)  In exchange for his plea, it was agreed he would receive a sentence of eight years in local custody and supervision.  Even though his negotiated resolution did not include a treatment program, defendant contends on appeal that the trial court abused its discretion by refusing to place him in a drug treatment program after

_____

[1] Further undesignated statutory references are to the Health and Safety Code in effect at the time of the charged offenses.

1

he walked away from a different treatment program the court had approved. Defendant also contends that there is no evidence to support a finding of his ability to pay the drug program fee.

Because the trial court never orally imposed the drug program fee, we order a correction of the abstract to omit the fee. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On December 2, 2011, defendant pleaded no contest to possession of methamphetamine for sale, and admitted he had a prior drug trafficking conviction and had served two prior prison terms. In exchange for his plea, counts for transporting heroin, transporting oxycodone, transporting methamphetamine, resisting arrest, providing false identification to a police officer, and driving on a suspended license were dismissed. Allegations that defendant had an additional prior drug trafficking conviction and had served two additional prior prison terms were also dismissed. The parties agreed that defendant would be sentenced to eight years of local prison custody and supervision. The agreement did not include a promise of a drug treatment program. In fact, before defendant entered his plea, the prosecutor made clear that a treatment program was not part of the plea agreement, and the court told defendant it was not committing to a treatment program.[3] After the court accepted defendant's plea, defense counsel asked that defendant be released to apply to residential treatment programs. The trial court denied the request and referred the matter to the probation department for an evaluation and recommendation.

---

[2] We dispense with a recitation of the facts underlying defendant's offense as they are not pertinent to the resolution of the issues on appeal.

[3] The plea form signed by defendant reads, "8 years stip state prison. This is a Local Time commitment & supervision under AB 109 upper term + 3 enhancements." No mention is made on the form of a treatment program.

In a presentence report filed January 10, 2012, the probation department noted defendant has 14 prior felony convictions, numerous parole violations, and is considered high risk to reoffend according to the Static Risk Assessment. The probation department recommended the trial court impose the eight-year prison sentence, which would be served in county jail. Nevertheless, at the hearing on January 10, 2012, the court, with the approval of the prosecutor, authorized defendant to be released on a one-day pass for an interview with the Salvation Army program and another one-day pass to the Delancey Street program.[4]

In a letter to the court dated January 31, 2012, the probation department responded to the court's request for a recommendation about whether defendant could be released to treatment while serving his term of confinement. The department noted that release during confinement was up to the sheriff. For a split sentence contemplating residential treatment, it recommended placement in a program only upon the commencement of the period of supervision.

On February 7, 2012, defense counsel and defendant advised that defendant had not been transported to Delancey Street. The trial court again authorized a one-day pass for that purpose.

On February 24, 2012, the court held a sentencing hearing pursuant to Penal Code section 1204.[5] Defense counsel argued for a sentence to the Delancey Street program if the program would accept him, with seven to eight years of mandatory supervision after completion of the program.

---

[4] The prosecutor indicated that he thought it important to have the programs interview defendant so that, whatever position he or the court might take later, there would be more information.

[5] Penal Code section 1204 provides in pertinent part that circumstances in aggravation or mitigation "shall be presented by testimony of witnesses examined in open court."

Defendant's girlfriend testified she had just graduated from a clean and sober program called Promise House and believed defendant was also committed to making that change. She also testified she knew that Delancey Street was a strict, two-year residential program that may not even let her see defendant for a long period of time.

Defendant testified that the primary motivation for his prior convictions was related to his drug addiction. He testified that he had been clean and sober for 14 months, the last 8 of which he had been in the Yolo County Jail. He also testified that he had had a "significant spiritual awakening," and described his NA and church related activities. He denied that he had ever been given an opportunity for a long-term treatment program.

At the conclusion of the hearing, the court continued the matter to give the parties time to consider a sentence in which the defendant could go to a program, but the court could maximize a custody sentence should defendant "not make good on this."

On March 9, 2012, defense counsel informed the court that defendant had been accepted at the Salvation Army program but that he had also been accepted into another program he believed "might be better for him" -- an "up-to-two year" program called U-Turn for Christ. Defense counsel explained that U-Turn for Christ was "residential in nature, and their terms are stricter, they're a bit out in the country, away from things." Defense counsel also said defendant had been approved for admission at River City Recovery, as well. Both Salvation Army and River City Recovery were available for admission immediately but defendant sought a continuance to explore whether U-Turn for Christ would be approved by the probation department. Defendant told the court that he preferred River City Recovery over Salvation Army because he understood Salvation Army was one-year residential with no transitional support into the community, while River City Recovery allowed participants to work after either six, nine, or twelve months. The court replied, "[W]e want a longer term program, and all we need to do is make sure that [U-Turn for Christ] passes muster with probation department." Earlier in the hearing, the court told defendant, this would be a "*one-time opportunity*. If you want to

4

think of it as a *one strike and you're out opportunity*, think of it in that way.  In that if you're serious about this you'll never be able to say again that you were never given an opportunity.  This is *the one time*."  (Italics added.)  The court continued the hearing for two weeks to investigate U-Turn for Christ.

On March 23, 2012, defense counsel informed the court that the U-Turn for Christ program was approved by the jail.  The program is also approved as an alternative sentencing facility for Sacramento County.  He also informed the court that James Worley, the program administrator, was prepared to pick defendant up that day to commence treatment and that he would be required to sign a minimum contract of one year.

Over the prosecutor's objection, the trial court released defendant into the U-Turn for Christ program.  In doing so, the trial court stated, "as the Court has previously said, this is *absolutely the last opportunity* Mr. Russell is going to be given.  [¶]  I hope he understands and has *no question regarding the Court's resolve should there be any failing at all in this program.*  [¶]  Do you understand?" (Italics added.)  Defendant replied, "Yes, sir."  The trial court then ordered defendant to "[o]bey all regulations for the program at U-turn for Christ."

The trial court scheduled a follow-up hearing for April 3, 2012, at 10:00 a.m., "to see if he's been placed."  The court then told defendant, "I am going to say as well, Mr. Russell, if, for some reason, you don't make connection with that program, you are to be back here on the next court date.  [¶]  If, for some reason, you are not in the program, it will be seven days a week AA/NA meetings.  [¶]  Do you understand?"  Defendant indicated he did and the court clarified that seven days a week included Sundays.  After a bench conference requested by the prosecutor, the trial court stated, "One additional point on the Russell matter; and that is, since it has been represented that the defendant is going into this program, I am going to direct that he is to be released only to James [Worley]."

5

On March 26, 2012, James Worley faxed a letter to the court advising that defendant had been released to his custody on Friday, March 24, 2012, but refused to complete and sign the U-Turn for Christ contract, and he left the program the following morning. The court issued a no-bail bench warrant.

Defendant failed to appear at the April 3, 2012, hearing. On April 6, 2012, he appeared in custody. When asked by defense counsel to explain in his own words what had happened, defendant told the court he had refused to enter the U-Turn for Christ program because he discovered upon his arrival that he would not be able to have contact with his girlfriend while he was there -- a condition to which he would not agree. He went to the Salvation Army the following Monday seeking admission. Tuesday, he went to "Sac Recovery" and River City Recovery and then back to Salvation Army. He also went to AA/NA meetings every day. On Thursday, March 29, 2012, he was admitted into the Salvation Army program. He tested clean for drugs at that time.[6] He had thought his next court date was April 4, 2012, but on April 3, a Salvation Army program worker looked up his case on the computer and told defendant his court appearance was in 30 minutes. Defendant called the court to let them know he would not be in and voluntarily appeared on April 4, whereupon he was taken into custody. Defendant requested that the court release him back to the Salvation Army program.

The trial court noted that most programs do not permit association with a girlfriend while trying to address one's addiction. The trial court also noted that defendant had previously insisted that U-Turn for Christ, not the Salvation Army, was the right program for him. It appeared to the trial court that defendant wanted to pick and choose what rules and program are appropriate, rather than comply with the court's orders.

---

[6] The Salvation Army program in which defendant was enrolled was a "Six month, Nine month, and One year work therapy rehabilitation program."

The trial court declined to send defendant back to the Salvation Army program and sentenced him to a split sentence, calculated as follows: 1,946 days in local custody, 974 days on mandatory supervision, including 365 days in a residential treatment program.

## DISCUSSION

### I. Denial of Placement into the Salvation Army Program

Defendant contends the trial court abused its sentencing discretion by denying his request to be placed into the Salvation Army program after he refused to enroll in U-Turn for Christ as ordered by the court. We reject his contention.

We first note that the court was under no obligation to allow defendant to enter a treatment program. Entry into a treatment program was not part of the negotiated resolution. Nor is consideration of a treatment program required by any statute or rule. The fact of the matter is that defendant had an extensive rap sheet developed over many, many years. The court did not abuse its discretion by sentencing him to extensive time in custody with a period of mandatory supervision and a year-long drug treatment program.

Defendant bases his abuse of discretion argument on the trial court's instructions that "if, for some reason, you don't make connection with that program, you are to be back here on the next court date. [¶] If, for some reason, you are not in the program, it will be seven days a week AA/NA meetings." But defendant did "connect" with the program -- as it is undisputed that James Worley picked him up and took him to the facility. Defendant then voluntarily disconnected from the program by walking away after refusing to sign the program contract.

Defendant argues on appeal that "[i]t was not clear that a failure to 'make a connection to that program' would necessarily trigger a jail sentence. The option of the daily AA/NA sessions reasonably gave the impression [defendant] could return and make different program arrangements." Yet, in the trial court, when defendant was given a chance to explain, he admitted, "I know I did the wrong thing by walking." Defendant

7

never claimed he thought the trial court's orders allowed him leeway to leave the court ordered program and make other arrangements as long as he attended AA/NA meetings; nor did defense counsel, who accurately described defendant's actions as "a terrible mistake." Now on appeal, defendant asserts a broad interpretation of the trial court's instructions regarding the failure to "connect" with the court ordered program to essentially include walking away from that program because *he did not want to be in that program*.

Even if defendant had actually believed he was in compliance by leaving the court ordered program and going to AA/NA meetings, we would not find that belief to be reasonable. The trial court repeatedly warned defendant this was his last opportunity, including a description of this last chance as a "one strike and you're out opportunity." Furthermore, the trial court specifically ordered defendant to "[o]bey all regulations for the program at U-turn for Christ." Defendant's refusal to do so, simply because he did not like the rules, did not excuse him from compliance. There is no abuse of discretion here.

## II. Drug Program Fee

Defendant also contends the trial court erred by ordering him to pay a $600[7] drug program fee pursuant to section 11372.7 without substantial evidence that he has the ability to pay such a fee. The trial court, however, did not orally order defendant pay the drug program fee. Thus, we shall order the abstract of judgment corrected to omit it.

The trial court orally imposed the mandatory $50 crime laboratory analysis fee (plus penalty assessments) pursuant to section 11372.5. Section 11372.7, subdivision (a), provides that persons convicted of drug offenses "shall pay a drug program fee in an amount not to exceed one hundred fifty dollars ($150) for each separate offense." But

---

[7] Presumably, the $600 figure includes one $150 drug program fee and $450 in penalty assessments.

section 11372.7, subdivision (b), provides in pertinent part: "The court shall determine whether or not the person who is convicted of a violation of this chapter has the ability to pay a drug program fee.  If the court determines that the person has the ability to pay, the court may set the amount to be paid and order the person to pay that sum to the county in a manner that the court believes is reasonable and compatible with the person's financial ability.  In its determination of whether a person has the ability to pay, the court shall take into account the amount of any fine imposed upon that person and any amount that person has been ordered to pay in restitution."

The abstract of judgment includes a $600 drug program fee (§ 11372.7, subd. (a).)  However, the trial court did not orally impose that fee.  Accordingly, we presume the trial court determined defendant did not have the ability to pay.  (*People v. Martinez* (1998) 65 Cal.App.4th 1511, 1516-1519.)

The People argue that defendant was ordered to pay the drug program fee in a written order he signed, and because he never complained he lacked the ability to pay, he forfeited the issue for purposes of appeal.  The People apparently refer to item number 10 on the written order for mandatory supervision.  Item number 10 has a line marked with an "X" next to a paragraph providing for the $50 criminal laboratory analysis fee.  Beneath that paragraph is a separate paragraph with no separate line for an "X."  This separate paragraph reads, "Pay a drug program fee *not to exceed* $150 plus a penalty assessment of $450, *determined by ability to pay*."[8]  (Italics added.)

---

[8]  The pertinent language is in item number 10 of the order and it reads as follows:

"X    (a) Pay $50 as a criminal laboratory analysis fee plus a penalty assessment of $150;
10.    (H&S Code § 11372.5)

    (b) Pay a drug program fee not to exceed $150 plus a penalty assessment of $450, determined by ability to pay; (H&S Code § 11372.7)."

The People's argument concerning this boilerplate form fails to persuade. Because there is no "X" by the drug program fee paragraph like the other orders checked by the court, there is no indication the court actually intended it as an order. And without an "X" next to this paragraph, defendant had no reason to believe the court was ordering the drug program fee. Consequently, defendant had no reason to object to the court's failure to make an ability to pay determination. Furthermore, no specific amount is indicated. Indeed, by the stated terms of the paragraph, the amount of the fee is conditional upon an ability to pay finding by the court and the form does not indicate any such finding had been made. Given that the language is conditional, no specific amount is stated, and the paragraph is not separately marked as are the other paragraphs ordered by the court, we cannot read the trial court's judgment to include this boilerplate paragraph.

Even assuming the single "X" was intended to cover both the order to pay the lab fee and the drug program fee, the judgment is the *oral* rendition of sentence.[9] (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Since the trial court did not orally pronounce the drug program fee, or at least orally reference the orders on the form, the fee was not included in the judgment. Thus, the abstract of judgment must be corrected to omit the $600 drug program fee.

---

[9] If the line for an "X" next to the paragraph pertaining to the lab fee is also intended to apply to the paragraph pertaining to the drug program fee, then the form appears to contemplate imposition of the later fee in all cases, regardless of ability to pay. The court should consider changing this form.

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment deleting reference to the drug program fee and forward a certified copy thereof to the relevant authorities.  The judgment is otherwise affirmed.


                                        MURRAY , J.


We concur:


  MAURO , Acting P. J.


  DUARTE , J.

11